# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UTILITY WORKERS UNION OF AMERICA, LOCAL 175, | : : : | Case No. 3:17-cv-339 |
| | : | Judge Thomas M. Rose |
| Plaintiff, | : : | |
| v. | : : | |
| THE DAYTON POWER & LIGHT COMPANY, et al., | : : : | |
| Defendants. | : : | |

## ENTRY AND ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (DOC. 2)

This case is before the Court on the Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction (Doc. 2) filed by Plaintiff Utility Workers Union of America, Local 175 ("Local 175"). The Court held telephone conferences with the parties regarding Local 175's Motion on October 2nd and 5th, 2017, after which Defendants The Dayton Power & Light Company, DPL, Inc., AES Ohio Generation LLC, and The AES Corporation (collectively, "Defendants") filed a Motion to Dismiss (Doc. 4) the Complaint for lack of subject-matter jurisdiction. Defendants also simultaneously filed a memorandum in opposition (Doc. 5) to the Motion for TRO and Preliminary Injunction, in response to which Plaintiff has filed a Reply (Doc. 7). Plaintiff also opposed Defendants' Motion to Dismiss, but the Court does not consider the Motion to Dismiss in this Entry and Order.

For the reasons below, the Court **DENIES** the Motion for TRO and Preliminary Injunction (Doc. 2).

I. <u>BACKGROUND</u>

A. <u>Parties</u>

Defendant Dayton Power & Light ("DP&L"), an Ohio corporation based in Dayton, Ohio, produces and distributes electric energy and provides service to customers in Southwest Ohio. (Doc. 1 at ¶ 4.) Plaintiff Local 175 is the duly recognized and exclusive bargaining agent for DP&L's Power Production, Service Operations and Financial Operations employees. (Doc. 1 at ¶ 3.)

Defendant AES Ohio Generation LLC ("AES Ohio") is engaged in the generation of electric power and wholesale power sales from existing generation facilities located in Ohio. (*Id.* at ¶ 7.) Plaintiff alleges that DP&L and AES Ohio are fully owned by Defendant DPL, Inc. ("DPL"), which is their immediate parent, and are "indirect, wholly owned subsidiaries of Defendant AES Corporation ("AES"). (*Id.* at ¶¶ 6-7.)

Plaintiff alleges that DP&L, DPL, AES Ohio and AES Corporation constitute a single employer due to the interrelation of their operations, common management, centralized control of labor relations and common ownership. (*Id.* at ¶ 8.)

B. <u>Factual Allegations</u>

Local 175 and DP&L are parties to a collective bargaining agreement, referred to as the Compact, that covers the terms and conditions of employment of all DP&L employees in the production and distribution of electric energy and in the service of

customers. (*Id.* at ¶ 8.) The Compact's effective date is November 1, 2014 through October 31, 2017. (*Id.*)

On August 24, 2017, Local 175 and DP&L held their first bargaining session regarding a new collective bargaining agreement. (*Id.* at ¶ 14.) At their next bargaining session on September 11, 2017, DP&L informed Local 175 that the Federal Energy Regulatory Commission had approved the transfer of two generation facilities, named Stuart Station and Killen Station, and their ancillary assets from DP&L to AES Ohio. (*Id.* at ¶ 15.) Stuart Station and Killen Station together employ more than 290 bargaining unit employees represented by Local 175. (*Id.* at 13.) AES Ohio thereafter joined in the negotiations between Local 175 and DP&L regarding the terms of a new collective bargaining agreement. (*Id.* at ¶¶ 16-18.)

On September 21, 2017, DP&L notified Local 175 that, after the transfer of assets from DP&L to AES Ohio, no Stuart Station and Killen Station employees would be entitled to use their seniority to bump into any position or to exercise "Career Preference" rights to transfer into open positions in DP&L's Service Operations or Financial Operations in Dayton, Ohio. (*Id.* at ¶ 18.) DP&L took the position that these employees would not be entitled to exercise these rights under the Compact because, after the transfer, they would cease to be DP&L employees. (*Id.* at ¶ 16.)

On the same day, Local 175 submitted a written grievance to DP&L and AES Ohio pursuant to the Compact's "Issue Resolution" process. (*Id.* at ¶ 20.) In the grievance, Local 175 alleges that DP&L's refusal to honor its employees' employment rights and seniority rights violated the Compact. (*Id.*) The Issue Resolution process

3

normally takes "months to complete" and culminates in the submission of the grievance to a neutral arbitrator for determination. (*Id.* at ¶ 21.)

On October 1, 2017, DP&L transferred Stuart Station and Killen Station to AES Ohio. AES Ohio has represented—and the parties do not dispute—that it intends to close Stuart Station and Killen Station effective June 1, 2018.

### C. **Plaintiff's Complaint and Motion for Preliminary Injunction**

On September 29, 2017, Local 175 filed the Complaint simultaneously with its Motion for TRO and Preliminary Injunction. (Docs. 1-2.) Local 175 alleges, as in its grievance, that Defendants violated the Compact by refusing to recognize the Stuart Station and Killen Station employees' contractual rights following the transfer of those facilities to AES Ohio. Local 175 seeks an injunction pending an arbitrator's determination of that issue pursuant to the Compact's Issue Resolution process.

Local 175 originally sought an injunction restraining DP&L from transferring Stuart Station and Killen Station to AES Ohio. (Doc. 2 at 1.) Due to the timing of Local 175's Motion, however, its request for that relief is moot as the transfer of assets has already occurred. Alternatively, Local 175 seeks an injunction "enjoining the Defendants from prohibiting affected bargaining unit employees represented by Plaintiff from exercising their rights under the [Compact] . . . including, but not limited to the right to bump into open positions in DP&L's Service Operations and/or Financial Operations located in the Dayton, Ohio area." (*Id.*)

4

### D. Defendants' Motion to Dismiss

Defendants moved to dismiss the Complaint and opposed the Motion for a TRO and Preliminary Injunction on the grounds that the Court does not have jurisdiction to enter injunctive relief under the Norris-LaGuardia Act, 29 U.S.C. §§ 101, 104. As mentioned above, Defendants' Motion to Dismiss is not yet ripe because the time for their Reply, if they decide to file one, has not run.

## II. LEGAL STANDARD

The Norris-LaGuardia Act provides:

> No Court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101. The term "labor dispute" is defined as "any controversy" between an employer and its employees "concerning terms and conditions of employment." 29 U.S.C. § 113(a)(1), (c).

The Norris-LaGuardia Act also specifically provides that:

> No court of the United States shall have jurisdiction to issue any injunction in any case involving or growing out of any labor dispute to prohibit any person . . . from . . .
>
> (a)   . . . refusing . . . to remain in any relation of employment . . . .

29 U.S.C. § 104.

Notwithstanding these express prohibitions against the issuance of injunctive relief, the Supreme Court has recognized certain circumstances in which a district court

5

may enter an injunction relating to a labor dispute under the Norris-LaGuardia Act. *See Buffalo Forge Company v. United Steelworkers of America*, AFL-CIO, 428 U.S. 397 (1976); *The Boys Markets v. Retail Clerks Union*, 398 U.S. 235 (1970). In *Boys Markets*, the Supreme Court articulated a four-step analysis that a district court must follow to determine whether to issue an injunction pending arbitration of a labor dispute:

> First, the controversy must involve or grow out of a labor dispute within the meaning of Section 4 of the Act. Second, a full evidentiary hearing must be held. Third, the court must find that the dispute underlying the controversy is subject to binding arbitration under the terms of the collective bargaining agreement. Finally, the traditional equitable bases for injunctive relief must be met.

*Lester Engineering Co.*, 718 F.2d at 822, citing *Boys Markets*, 398 U.S. at 249-53. "A court has jurisdiction to issue an injunction only where all four of the above steps have been completed and satisfied." *Id*.

### III. ANALYSIS

The Court need not address the jurisdictional question raised by Defendants at this time because—assuming jurisdiction exists—the traditional equitable bases for injunctive relief have not been met. Specifically, Plaintiff has not demonstrated that it would suffer irreparable harm absent the entry of the requested injunction.

The Sixth Circuit has recognized that the "traditional equitable bases for injunctive relief" referenced in *Boys Market* are those outlined in Section 7 of the Norris-LaGuardia Act and are the same as the elements required to obtain a preliminary injunction. *Id.* Namely, a party must show that the "(1) unlawful acts have been threatened or committed in violation of the collective bargaining agreement; (2)

6

substantial and irreparable injury will occur; (3) greater injury will occur by denying the injunctive relief sought than by granting it; and (4) there is no adequate legal remedy for the violation of the collective bargaining agreement." *Id*. The Sixth Circuit has recognized that "the irreparability of the injury suffered by the union has in many cases become virtually the sole inquiry in those cases where injunctive relief is sought against an employer." *Aluminum Workers Int'l Union, AFL-CIO, Local Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 443 (6th Cir. 1982).

Local 175 asserts that it would suffer irreparable injury because "[i]f DP&L maintains its position, that after October 1, 2017 the affected bargaining unit employees would no longer be DP&L employees and not entitled to exercise bumping and Career Preference rights, clearly the arbitration process would be frustrated" and Local 175's success in that process would be "meaningless." (Doc. 2 at 10-11.) Local 175 reasons that the arbitration process is unlikely to conclude before the closing of Stuart Station and Killen Station; and, once those facilities close, their employees will face permanent unemployment. (Doc. 6 at 3-5.) Plaintiff further argues that AES Ohio will not have the ability to satisfy an award of backpay and reinstatement for those employees, which are the traditional remedies in such circumstances. (*Id.* at 5.)

The Court is guided in its consideration of this issue by the Sixth Circuit's decision in *Aluminum Workers International Union, AFL-CIO, Local Union No. 215 v. Consolidated Aluminum Corporation*, 696 F.2d 437 (6th Cir. 1982). In that case, the district court enjoined an employer from reorganizing its job classifications, which would have resulted in sixteen employees losing their jobs, pending arbitration of that issue with the

employees' union. *Id.* at 439. The employer sought review of the district court's issuance of the injunction under the same four-step analysis applicable here.

The Sixth Circuit's analysis of whether the union demonstrated irreparable harm is instructive:

> The injury complained of here is loss of employment for sixteen persons. The Union argues that loss of employment constitutes irreparable harm because awards of backpay and reinstatement, traditional remedies for such an injury, cannot fully compensate employees for the repossessions, foreclosures, and injury to credit stature which could accompany unemployment. We disagree insofar as loss of employment is, as it is here, solely the result of job eliminations by a solvent employer. Absent some indication of action on the part of the employer which could jeopardize its ability to reinstate affected employees or to pay them wages for the period of unemployment, we hold that loss of employment, even if occasioned by employer action which is subject to arbitration, is not irreparable harm and will not support a claim by the union for injunctive relief.

*Aluminum Workers*, 696 F.2d at 443. The Sixth Circuit then distinguished two Fourth Circuit cases in which "compelling circumstances" justified the issuance of injunctive relief. *Id.* at 444, discussing *Drivers, Chauffeurs, Warehousemen and Helpers, Teamsters Local Union No. 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336 (4th Cir.1978) and *Lever Brothers Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115 (4th Cir.1976). The Sixth Circuit concluded: "There being no evidence in the record to suggest [Employer's] ability to render backpay or to reinstate the sixteen employees in the event of an arbitrator's decision for the Union, we hold that the Union failed to establish that it will suffer irreparable harm as a result of [Employer]'s actions." *Aluminum Workers*, 696 F.2d at 444.

In this case, the Court similarly finds no evidence that Defendants would be unable to render backpay or reinstate the employees who would lose their jobs when Stuart Station and Killen Station close. Local 175 argues that, because Defendants contend that Stuart Station and Killen Station employees are no longer employed by DP&L, AES Ohio will be solely responsible for any arbitration award. Local 175 then argues that, once AES Ohio closes the generation facilities, it will not have sufficient assets from which to satisfy an arbitration award. Neither of these arguments withstands scrutiny.

While it is true that Defendants have taken the position that DP&L no longer employs the Stuart Station and Killen Station employees, Local 175 contends that DP&L and AES Ohio are a "single employer" for purposes of the Compact. If Local 175 prevails at arbitration, it will have prevailed on its "single employer" theory. It stands to reason that Local 175 therefore would be entitled to enforce the bargaining unit employees' rights against both of those entities. Indeed, Local 175 is asking this Court to order Defendants to allow the bargaining unit employees to do just that. (The transfer of assets from DP&L to AES Ohio has already occurred; yet, if Local 175 were to obtain its requested injunction, its employees (now working for AES Ohio) would be enforcing bumping rights against DP&L.) Thus, Local 175's contention that AES Ohio would be solely responsible for any arbitration award does not logically follow from its own position on the issues subject to arbitration.

Local 175's argument that AES Ohio might not have sufficient assets to satisfy an arbitration award is also unsupported. For the same reasons just discussed, both

DP&L's and AES Ohio's ability to satisfy any award, rather than just AES Ohio's ability to do so, is the relevant inquiry. There is no evidence that both DP&L and AES Ohio would be unable to satisfy an arbitration award against them. The assertion that AES Ohio alone would be unable to do so is also speculative. There is nothing in the record regarding AES Ohio's financial condition or other assets, besides the newly acquired Stuart Station and Killen Station.

It should also be noted that it is speculative to presume that the arbitration process will not conclude before the closing of these facilities. *See Aluminum Workers*, 696 F.2d at 444. Defendants have agreed to arbitration and, at this time, the anticipated closing of the facilities is more than seven months away.

In sum, Local 175 has not demonstrated that it would suffer irreparable harm and therefore is not entitled to entry of its requested injunction.

## IV. <u>CONCLUSION</u>

For the reasons above, the Court **DENIES** Local 175's Motion for TRO and Preliminary Injunction (Doc. 2).

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, October 17, 2017.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE
